Ray D. Hacke, OSB #173647
PACIFIC JUSTICE INSTITUTE
P.O. Box 5229
Salem, OR 97304
Phone: (503) 917-4409
Facsimile: (916) 857-6902
E-Mail: rhacke@pji.org

Attorneys for Plaintiff
KATHERINE G. TALMAN

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KATHERINE G. TALMAN, An Individual,<br><br>Plaintiff,<br><br>v.<br><br>CHESTNUT LANE OPERATIONS, LLC dba AVAMERE AT CHESTNUT LANE, A Limited Liability Corporation; OREGON CARE PARTNERS CAREGIVER TRAINING, A Public Benefit Corporation; and OREGON DEPARTMENT OF HUMAN SERVICES, An Oregon Public Agency,<br><br>Defendant(s) | Case No.:<br><br>**COMPLAINT FOR DAMAGES FOR RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII [42 U.S.C. § 2000e-2] AND ORE. REV. STATS. § 659A.030(1)(a), AND VIOLATION OF FIRST AMENDMENT [42 U.S.C. §§ 1983 & 1985]**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff KATHERINE G. TALMAN hereby alleges as follows:

**PARTIES**

1.      Plaintiff, at all times relevant herein, is a former employee of Defendant

CHESTNUT LANE OPERATIONS, LLC dba AVAMERE AT CHESTNUT LANE

("CHESTNUT LANE"). Specifically, Plaintiff worked for CHESTNUT LANE as a Support

Services Provider for nearly eight years before CHESTNUT LANE suspended her without pay in January 2025 and ultimately terminated her employment.

2.	Plaintiff is also, and at all times relevant herein was, a U.S. citizen and a practicing Christian who cannot "affirm" conduct she believes the Bible condemns. Such conduct, in Plaintiff's view, includes homosexual acts and self-identifying as one sex when one is, in fact the opposite sex – or, for that matter, self-identifying as anything other than male or female. At the same time, Plaintiff strictly follows biblical principles that require her to "love her neighbor" and, accordingly, treat her fellow human – LGBT+[1]  or otherwise – with the utmost kindness, respect, dignity, and compassion while not affirming what the Bible calls "sin."

3.	Defendant CHESTNUT LANE is, and at all times relevant herein was, a limited liability corporation that operates a long-term assisted living facility in Gresham, Oregon. The facility serves, and at all times relevant herein served, the aging and people with disabilities ("APDs") – Deaf and DeafBlind individuals in particular. A true and accurate copy of CHESTNUT LANE's proof of registration from the Oregon Secretary of State's website is attached hereto as **Exhibit "A."**

4.	Defendant CHESTNUT LANE operates its assisted living facility under the banner of Avamere, a chain of long-term care facilities headquartered in Wilsonville, Oregon.[2]

5.	Defendant OREGON CARE PARTNERS CAREGIVER TRAINING ("OREGON CARE PARTNERS") is a public benefit corporation that offers state-funded caregiver training to professionals tasked with caring for APDs in Oregon. Among the training OREGON CARE PARTNERS offers is LGBT+ inclusivity training. OREGON CARE

---

[1] "LGBT+" is an ever growing and evolving acronym. For simplicity's sake, all letters in the acronym after "T" will hereinafter be represented by the "plus" sign ("+") unless a longer version of the acronym is quoted from another source. Plaintiff intends no disrespect to anyone's gender identity or sexuality by excluding a particular group's representative letter.

[2] *See* https://www.avamere.com/locations/ (last viewed on April 8, 2026).

PARTNERS' website declares that the training it offers is approved by Defendant OREGON DEPARTMENT OF HUMAN SERVICES ("ODHS") and "meets Oregon Administrative Rule training requirements on providing inclusive care for LGBTQIA2S+ residents and residents living with HIV for owners, providers, staff, and contractors working in" long-term assisted living facilities in Oregon.[3] A true and accurate copy of OREGON CARE PARTNERS' proof of registration from the Oregon Secretary of State's website is attached hereto as **Exhibit "B."**

6.  Defendant OREGON CARE PARTNERS is, and at all times relevant herein was, the entity specifically designated and promoted by Defendant ODHS to administer LGBT+ inclusivity training to employees of long-term assisted living facilities in Oregon on ODHS' behalf. *See* Attached **Exhibit "C"** [a letter dated July 25, 2024 that ODHS sent to all operators of long-term assisted living facilities throughout Oregon, including Defendant CHESTNUT LANE, concerning training and licensure requirements for calendar year 2024 and beyond].

7.  Defendant ODHS is, and at all times relevant herein was, the Oregon state agency tasked with granting licenses to caregivers who work at long-term assisted living facilities serving APDs within the State of Oregon. ODHS is charged with promulgating the Oregon administrative rules concerning training requirements for caregivers at assisted living facilities operating in Oregon. ODHS also created the training that OREGON CARE PARTNERS administers to staff employed at assisted living facilities in Oregon. *See* Ex. "C."

### JURISDICTION

8.  Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

9.  This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1331 because Plaintiff's action arises under the Constitution and laws of the United States.

10.  This action also concerns civil rights pursuant to 28 U.S.C. § 1343.

---

[3] *See* https://oregoncarepartners.com/app/#/class-details/3726 (last viewed April 7, 2026).

11.     This Court has supplemental jurisdiction over any and all state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) in that such claims are related to and form part of the same case and controversy as Plaintiff's federal claims.

**VENUE**

12.     Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

13.     Venue is proper in the Court's Portland Division because:

   a.   Defendant CHESTNUT LANE is headquartered and operates almost exclusively in Multnomah County;

   b.   Defendants OREGON CARE PARTNERS and ODHS maintain offices and serve businesses and individuals in Multnomah County;

   c.   The events giving rise to this Complaint occurred in Multnomah County; and

   d.   All agents, employees, or other persons working for or in concert with Defendants CHESTNUT LANE, OREGON CARE PARTNERS, and ODHS with regard to the events giving rise to this case are located in, employed in, residents of, or businesses or state agencies that serve Multnomah County.

14.     Venue is also proper in the Court's Portland Division because Defendant ODHS' policies concerning licensure for employees of assisted living facilities apply throughout the State of Oregon, making ODHS subject to suit in all federal courts in the State of Oregon.

**GENERAL ALLEGATIONS**

15.     Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

16.     Plaintiff is, and at all times relevant herein was, a practicing Christian who worked for Defendant CHESTNUT LANE as a support services provider.  Her duties involved working with seniors as well as Deaf and DeafBlind individuals housed at CHESTNUT LANE's assisted living facility in Gresham, Oregon.

17.    Plaintiff was qualified for her position and had an exemplary employment record.

18.    While working for Defendant CHESTNUT LANE, Plaintiff had no history of discrimination against persons in any protected class and strove to be an exemplary employee. In fact, shortly before Christmas in 2024, Plaintiff received a Staff Appreciation Award from CHESTNUT LANE.

19.    In accordance with her Christian faith, Plaintiff subscribes to the traditional biblical view of sexuality and gender:

    a.    Concerning sexuality, Plaintiff believes all sex engaged in outside of marriage, which the Bible defines as the exclusive lifelong union between one man and one woman, is sin. In Plaintiff's view sex "outside of marriage" includes homosexual conduct.

    b.    Concerning gender, Plaintiff believes:

      i.    God created all persons male and female;

      ii.    A person's gender is determined by biology (DNA, genitalia, internal organs, etc.), not by how a person "self-identifies." In other words, in Plaintiff's view, consistent with God's supreme authority as the author of creation, there is no such thing as a "transgender," "non-binary," or "genderqueer" person – there are only male and female people, and God never puts a male in a female's body, or vice versa;

      iii.    Gender is an immutable characteristic that cannot be changed regardless of what artificial attempts to change it a person undergoes, be it hormone treatments or surgical procedures; and

      iv.    Any "gender expression" – clothing, behaviors, etc. – that is inconsistent with the gender God created a person to be before birth is sinful.

20.    Plaintiff recognized that it was essential for her to treat all residents of Defendant CHESTNUT LANE's assisted living facility. LGBT+ or otherwise, with respect, dignity, and

compassion – pursuant not only to her employment-related duties, but the requirements of her Christian faith. Plaintiff consistently fulfilled this job requirement throughout her tenure as an employee of CHESTNUT LANE.

21.    In 2023, Oregon's legislature enacted a law ("Senate Bill 99") mandating LGBT+ "inclusivity" training for caregivers at all long-term assisted living facilities in Oregon that serve APDs. Defendant ODHS claims Senate Bill 99 aims to ensure that all APDs at assisted living facilities receive "dignified, respectful, and discrimination-free care." *See* Ex. "C."

22.    In July 2024, Defendant ODHS sent to all operators of long-term assisted living facilities serving APD individuals in Oregon, including Defendant CHESTNUT LANE, a letter (the "Licensure Letter") declaring that all employees of such facilities must complete state-mandated online training provided through Defendant OREGON CARE PARTNERS before the end of 2024 as a condition of being licensed to work for said facilities. *See* Ex. "C."

23.    Defendant ODHS conditioned caregivers' continued employment at long-term assisted living facilities – and the ability to work for other such facilities in the future – on such licensure. *See* Ex. "C." Employees who completed the ODHS-mandated training would be licensed for two years. *Id.*

24.    In November 2024, in response to the Licensure Letter, Defendant CHESTNUT LANE required all of its employees, including Plaintiff, to complete the online training provided by Defendant OREGON CARE PARTNERS. As required by the Licensure Letter, CHESTNUT LANE required its employees to complete their training no later than December 31, 2024.

25.    Within two weeks of learning about the training and licensure requirement, in the hopes of maintaining her employment with Defendant CHESTNUT LANE, Plaintiff began the online LGBT+ inclusivity training administered by Defendant OREGON CARE PARTNERS on Defendant ODHS' behalf.

26.    The roughly 90-minute training concluded with a multiple-choice exam. Upon completing the exam, caregivers would receive a certificate of completion – i.e., a license – that

would let them keep working for their current employers or, should they change jobs, other assisted living facilities.

27.    Defendant ODHS conditioned grants of licenses – which were good for up to two years – upon caregivers completing their exams with a perfect score of 100 percent.

28.    While taking the exam in hopes of completing the training provided by Defendant OREGON CARE PARTNERS and maintaining her employment with Defendant CHESTNUT LANE, Plaintiff viewed an interactive slide featuring a pastor standing behind a lectern, reading from a Bible, and purportedly preaching to an unseen audience of APDs at an assisted living facility. A true and accurate copy of the relevant slide is attached hereto as **Exhibit "D."**

29.    The relevant interactive slide poses a hypothetical in which the aforementioned fictitious pastor reads a Bible verse condemning LGBT+ conduct – specifically, Leviticus 20:13, which states, "If a man lies with a man as one lies with a woman, both of them have done what is detestable. They must be put to death; their blood will be on their own heads."[4] *See* Ex. "D."

30.    The slide then asks how an LGBT+ resident of an assisted living facility would feel upon hearing the pastor quote Leviticus 20:13 and gives the caregiver taking the training three responses to choose from [*see* Ex. "D"]:

      a.   "It doesn't matter. No LGBTQIA2S+ residents at your facility attend the church service anyway."

      b.   "An LGBTQIA2S+ resident may feel unsafe and threatened if they heard this in their home facility."

      c.   "An LGBTQIA2S+ resident probably wouldn't have any feelings about this since they've survived so much hardship anyway. Words can't really hurt."

31.    For purposes of completing the exam with a score of 100% and thereby obtaining licensure, the correct response out of the choices provided above is the second one.

32.    As a Christian, Plaintiff found the slide objectionable for multiple reasons:

---

[4] The slide does not indicate which version of the Bible it purports to quote, and there are many.

a. First and foremost, the slide takes the quote, which is from the Bible's Old Testament, out of its biblical historical context: From a theological standpoint, the quote comes from God's old covenant with the Jewish people, which does not apply to Christians in the modern age, as verses in the Bible's New Testament indicate. *See*, e.g., Galatians 5:18 and Romans 6:14. The slide omits any and all discussion from the Bible's New Testament concerning Jesus Christ's atonement for mankind's sins – including but not limited to homosexual conduct, via his death on the cross. In fact, the belief that Christ has redeemed sinful men and women via His death and resurrection so they would not have to endure punishment, on Earth or eternally, is the linchpin of the Christian faith. To draw an analogy from law, reading Leviticus 20:13 without reading, say, John 8:1-11, where Jesus Christ defends a woman from men wanting to stone her to death for committing adultery, would be equivalent to reading *Plessy v. Ferguson* [declaring racial segregation constitutional] to determine the government's stance on racial equality while ignoring *Brown v. Topeka Bd. of Educ.* [overturning *Plessy*].

b. Second, on a related note, the slide ignores any and all discussion from the Bible concerning the love and compassion Christ shows toward sinners – a group that not only includes homosexuals, but all of humankind. *See*, e.g., John 3:16; Romans 3:23, 5:8, and 8:1; 2 Corinthians 5:21; and 1 Peter 3:18.

c. Third, the slide portrays Christians in an invidiously stereotypical manner – specifically, as unduly harsh, heartless, judgmental, and even needlessly cruel toward LGBT+ individuals. Plaintiff knows many Christians who strive to demonstrate love and compassion to their LGBT+ neighbors and accordingly abstain from mistreating them despite not seeing eye-to-eye with them about their lifestyle. Plaintiff counts herself among that group.

d. Lastly, to answer the slide correctly, Plaintiff would have to affirm that biblical teachings would harm LGBT+ persons when shared with them and deny the transformative power of the gospel of Jesus Christ.

33. Feeling targeted for hostile treatment by the slide – which Defendant ODHS impliedly endorsed via the Licensure Letter [*see* Ex. "C"] – Plaintiff complained to Renee Rickard, Defendant CHESTNUT LANE's Executive Director, via text message on November 12, 2024 that "[t]his training includes religious persecution against my faith which has been singled out" and warns that "[i]f this slide is shown as an example against Christians," she would bring it to the attention of Avamere's head office. *See* Attached **Exhibit "E"** [a true and accurate copy of the relevant text message].

34. Defendant CHESTNUT LANE responded by repeatedly insisting that the LGBT+ inclusivity training was mandated by state law and there was nothing Avamere's head office could do about it. *See* Ex. "E" and Attached **Exhibit "F"** [a true and accurate copy of a text message exchange between Plaintiff and CHESTNUT LANE's Kellee Haddan in which Haddan threatens termination of Plaintiff's employment if she does not complete the training].

35. Unable to select the second choice on the slide – or any choice, for that matter – without violating her sincerely held religious beliefs, Plaintiff asked her employer, Defendant CHESTNUT LANE, for a religious accommodation – specifically, a comparable "alternative instruction that does not compel LGBTQIA2S+ viewpoints." *See* Attached **Exhibit "G"** [a letter from Plaintiff's counsel to CHESTNUT LANE dated December 13, 2024 concerning CHESTNUT LANE's affirmative obligation to accommodate Plaintiff's sincere religious beliefs pursuant to Title VII]. In fact, Plaintiff asked for a religious accommodation twice – orally to Rickard on November 13, 2024, then again via letter through counsel a month later on December 14, 2024. *See* Ex. "G."

36. Avamere, which oversees the operations of Defendant CHESTNUT LANE as well as other assisted living facilities that bear its name, offers a telephone hotline to employees

at Avamere facilities who claim to have suffered unlawful discrimination. Though Plaintiff raised a complaint with Avamere via that hotline, her efforts to bring pressure to bear on CHESTNUT LANE through its parent corporation to comply with federal and state laws prohibiting religious discrimination by employers yielded no results.

37.    Waiting to hear back concerning whether Defendant CHESTNUT LANE would accommodate her sincere religious beliefs, as Title VII and Oregon state law both require, Plaintiff did not complete the training provided by Defendant OREGON CARE PARTNERS, as she could not in good conscience do so.

38.    Plaintiff ultimately heard back from Defendant CHESTNUT LANE on or about January 2, 2025. CHESTNUT LANE informed Plaintiff at that time via a text message from Renee Rickard stating that Plaintiff needed to ask Defendant ODHS for a religious exemption from the training requirement – an odd assertion given that Plaintiff was not an ODHS employee. *See* Attached **Exhibit "H"** [a true and accurate copy of the relevant text message].

39.    Defendant CHESTNUT LANE gave Plaintiff one week to obtain from Defendant ODHS a religious exemption from the LGBT+ inclusivity training requirement. *See* Ex. "H." Given how slowly the wheels of government generally turn, CHESTNUT LANE either knew or reasonably should have known that one week was nowhere near enough time for Plaintiff to get an exemption from ODHS, even assuming there was a procedure by which she could obtain one.

40.    Because Plaintiff had not completed the training provided by Defendant OREGON CARE PARTNERS as of January 2, 2025, Defendant CHESTNUT LANE suspended her without pay, effective immediately, while she pursued a religious exemption from Defendant ODHS. *See* Ex. "H." CHESTNUT LANE also informed Plaintiff at that time that if she did not secure an exemption, CHESTNUT LANE would proceed with terminating her employment. *Id.*

41.    Neither Defendant ODHS, the Oregon Administrative Rules, the Licensure Letter, the text of Senate Bill 99, nor ODHS' "Frequently Asked Questions" ("FAQs") page concerning LGBT+ inclusivity training prescribes any procedure for religious caregivers to

pursue exemptions from the LGBT+ inclusivity training requirement. *See* Attached **Exhibits "I"** [a true and accurate copy of Senate Bill 99] and **"J"** [a true and accurate copy of ODHS' FAQs]. In fact, the texts of the Licensure Letter, Senate Bill 99, and ODHS' FAQs indicate – or at least strongly imply – that no religious exemptions are available. *See* Exs. "C" ["All staff of APD long-term care settings are required to take the training …"], "I" [specifically, § 6(1)-(2)] and "J" ["(A)ll long-term care facility staff … are required to complete this training"].

42.     Defendant ODHS has a history of denying various types of licenses to Christians in the name of protecting allegedly vulnerable LGBT+ persons. Obtaining a religious exemption from ODHS' LGBT+ inclusivity training requirement was thus essentially a fool's errand – especially since Defendant CHESTNUT LANE only gave Plaintiff one week to do it.

43.     Regardless, Plaintiff did make a good-faith attempt to obtain a religious exception from Defendant ODHS. In fact, she visited two ODHS-affiliated offices during the week after Defendant CHESTNUT LANE suspended her without pay: One operates under the name East Multnomah Aging and Disability Services ("East Multnomah") and is located at 600 N.E. 8th St., Room 100, Gresham, Oregon, 97030. The other operates under the name East Portland-Self Sufficiency and is located at 11826 N.E. Glisan St., Portland, Oregon, 97220 ("East Portland").

44.      The employees of Defendant ODHS to whom Plaintiff spoke were confounded by the idea of a religious exemption – they had never heard such a thing was even available to caregivers subject to the LGBT+ inclusivity training. Even so, the ODHS employees Plaintiff spoke with attempted to help her, directing her both to ODHS' Office of Aging and Disabilities at East Multnomah and ODHS' Compliance Office at East Portland.

45.     Despite her good-faith efforts to obtain one, Defendant ODHS never gave – and, in effect, denied – Plaintiff a religious exemption from the LGBT+ inclusivity training requirement.

46.     Because Plaintiff was unable to obtain a religious exemption from Defendant ODHS, Defendant CHESTNUT LANE terminated her employment on January 10, 2025. *See*

Attached **Exhibit "K"** [a true and accurate copy of a text message from Renee Rickard to Plaintiff dated January 10, 2025, informing her that her employment had been terminated].

47.     Plaintiff has been unable to seek employment as a caregiver for APDs since her firing due to her inability to complete the state-mandated LGBT+ inclusivity training and thereby obtain a caregiving license.

48.     Plaintiff, a 54-year-old single mother, has attempted to mitigate her damages by working three part-time jobs to help support herself and her two teenage children. Even with those three jobs, Plaintiff is still earning less than she did before Defendant CHESTNUT LANE terminated her employment.

49.     Plaintiff has also had to obtain unemployment benefits, go on state welfare and assistance programs, and receive food stamps to take care of her two teenage children. In addition, she fell behind on paying her bills, and though she received assistance from various utility companies, she is still paying off her water bill.

50.     Due to Defendant CHESTNUT LANE's firing of Plaintiff and her subsequent inability to obtain employment as a caregiver for APDs at long-term care facilities, Plaintiff has incurred non-economic damages, including but not limited to the following:

      a.  Stress-induced health issues, including pain/tightness in her neck and upper back, headaches, tremors, depression, anger, anxiety and sleep problems;

      b.  Tension in her body that requires regular visits to an acupuncturist;

      c.  Increased ringing in her ears; and

      d.  Weight gain – she has packed 18 pounds onto her compact 5-foot-1 frame.

51.     As a condition of filing the herein lawsuit, Plaintiff filed a charge of discrimination against Defendant CHESTNUT LANE with the Equal Employment Opportunity Commission ("EEOC") in February 2025.

52.     Plaintiff has since obtained a notice of determination from Oregon's Bureau of Labor & Industries with whom her charge of discrimination was cross-filed upon her filing with the EEOC. A true and accurate copy of that notice is attached hereto as **Exhibit "L."**

53.    Attached hereto as **Exhibit "M"** is a true and accurate copy of a printout from the website TimeandDate.com showing when the 90-day statute of limitations set forth in Plaintiff's right-to-sue letter is set to expire. Plaintiff included this printout to show that he timely filed this lawsuit in compliance with the deadline set forth in her right-to-sue letter.

**FIRST CAUSE OF ACTION:**
**Violation of Title VII – Failure to Accommodate**
**[42 U.S.C. § 2000e-2]**
**Against Defendant CHESTNUT LANE**

54.    Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

55.    Title VII of the 1964 Civil Rights Act prohibits employers from discriminating on the basis of religion. 42 U.S.C. § 2000e-2(a)(1).

56.    Title VII defines "employer" to mean "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year …" 42 U.S.C. § 2000e(b).

57.    Defendant CHESTNUT LANE qualifies as an employer under Title VII.

58.    The term "religion," for purposes of Title VII, "includes all aspects of religious observance and practice, as well as belief …" 42 U.S.C. § 2000e(j).

59.    As a practicing Christian, Plaintiff belongs to a class of persons protected under Title VII. 42 U.S.C. § 2000e-2(a)(1).

60.    Plaintiff has a bona fide religious belief that she cannot contribute to the state- or employer-sponsored persecution of herself and fellow Christians by speaking messages that disparage her faith, other Christians, or possibly even God Himself.

61.    Plaintiff's bona fide religious belief conflicted with her employment-related duty to complete the LGBT+ inclusivity training mandated by Defendant ODHS and provided through Defendant OREGON CARE PARTNERS, which at best impliedly and at worst overtly and invidiously stereotypes Christians as being unduly harsh, heartless, judgmental, and even

needlessly cruel toward LGBT+ individuals. *See* Ex. "D." In order to complete the training, obtain licensure, and continue her employment with Defendant CHESTNUT LANE, Plaintiff would have had to disparage her faith: By selecting Option 2 on the aforementioned interactive slide – i.e., "An LGBTQIA2S+ resident may feel unsafe and threatened if they heard this in their home facility" – Plaintiff would have had to assert that the quoted Bible verse would be harmful or offensive to LGBT+ residents of CHESTNUT LANE. *Id.*

62.    Plaintiff informed Defendant CHESTNUT LANE of the conflict between her sincerely held religious beliefs and her employment-related duty to complete the mandated training. See Exs. "E"-"G."

63.    Defendant CHESTNUT LANE failed to provide Plaintiff with a reasonable accommodation of her sincerely held religious beliefs and, in fact, attempted to pawn that duty off on Defendant ODHS – which, not being her employer, was in no position to grant such an accommodation. Nor, for that matter, did ODHS prescribe a procedure for Plaintiff to even apply for a religious exemption from the LGBT+ inclusivity training requirement.

64.    Sending Plaintiff to get a religious exemption from Defendant ODHS was not an accommodation – it was an attempt by Defendant CHESTNUT LANE to pass the buck and absolve itself of blame if ODHS did not grant such as an exemption.

65.    Defendant CHESTNUT LANE would have incurred no undue hardship by accommodating Plaintiff's religious beliefs. CHESTNUT LANE's obligation to comply with Senate Bill 99's LGBT+ inclusivity training requirement is no excuse, especially since the Free Exercise Clause of the U.S. Constitution's First Amendment prohibits states agencies such as Defendant ODHS, and Title VII prohibits employers such as CHESTNUT LANE, from demonstrating hostility toward Christians or Christianity in the name of preventing dignitary harm to individuals who self-identify as LGBT+.

66.    Even so, Defendant CHESTNUT LANE subjected Plaintiff to multiple adverse employment actions, including suspending her without pay and terminating her employment.

67.     Based on the foregoing, Defendant CHESTNUT LANE has unlawfully discriminated against Plaintiff in violation of Title VII.

### SECOND CAUSE OF ACTION:
**Violation of State Law Prohibiting Religious Discrimination**
**[Ore. Rev. Stats. § 659A.030(1)(a)]**
**Against Defendant CHESTNUT LANE**

68.     Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

69.     Like Title VII, Ore. Rev. Stats. § 659A.030(1)(a) prohibits employers from discharging individuals from employment on the basis of religion. Because the analysis for religious discrimination claims under both statutes is identical [*see Hedum v. Starbucks Corp.*, 546 F. Supp. 2d 1017, 1022 (D. Ore. 2008)], a violation of Title VII likewise violates Ore. Rev. Stats. § 659A.010(1)(a).

70.     Based on the foregoing, in addition to violating Title VII, Defendant CHESTNUT LANE has violated ORS 659A.030(1)(a).

### THIRD CAUSE OF ACTION
**Deprivation of Religious Freedom**
**[U.S. Const. amends. I & XIV; 42 U.S.C. § 1983]**
**Against Defendants OREGON CARE PARTNERS and ODHS**

71.     Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

72.     Under 42 U.S.C. § 1983, anyone who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States" to be deprived "of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

73.     Under 42 U.S.C. § 1983, government entities like Defendant ODHS and state actors like Defendant OREGON CARE PARTNERS can be held liable for civil rights violations that arise out of a governmental or proprietary function.

74.     Given that Defendant OREGON CARE PARTNERS is the entity officially endorsed by Defendant ODHS and tasked with administering the LGBT+ inclusivity training on ODHS' behalf throughout the State of Oregon [*see* Ex. "C"], OREGON CARE PARTNERS qualifies as a state actor.

75.     The Free Exercise Clause of the U.S. Constitution's First Amendment, as applied to states via the Fourteenth Amendment, prohibits states from "send[ing] a signal of official disapproval" of religious teachings, and individuals' sincerely held beliefs, concerning marriage, gender, and/or sexuality in the name of preventing dignitary harm to individuals who self-identify as LGBT+. *See*, e.g., *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 638 (2018) and *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021).

76.     In approving the inclusion of the interactive slide containing the Bible verse calling for homosexuals to be put to death as part of its mandatory LGBT+ inclusivity training for caregivers at long-term assisted living facilities, Defendant ODHS sent a signal of official disapproval of Christian beliefs concerning the sinfulness of homosexuality.

77.     In administering the LGBT+ inclusivity training on Defendant ODHS' behalf, Defendant OREGON CARE PARTNERS conveyed to Plaintiff ODHS' signal of official disapproval of Christian beliefs concerning the sinfulness of homosexuality.

78.     The Free Exercise Clause likewise confers upon Plaintiff the right to worship Jesus Christ freely, without fear of government showing hostility toward her Christian faith and/or distrust of its practices and making her feel persecuted accordingly.

79.     In requiring Plaintiff to undergo the LGBT+ inclusivity training as a condition of continued employment with Defendant CHESTNUT LANE, Defendant ODHS, acting both in its own capacity and through Defendant OREGON CARE PARTNERS, demonstrated hostility toward the Christian faith and distrust of its practices via the LGBT+ inclusivity training, which perpetuates invidious stereotypes of Christians – specifically, that they are unduly harsh, heartless, judgmental, and even needlessly cruel toward LGBT+ individuals.

80.     Moreover, Defendant ODHS, acting both in its own capacity and through Defendant OREGON CARE PARTNERS, attempted to compel Plaintiff to embrace the State's orthodoxy concerning LGBT+ individuals as a condition of licensure: In order to complete the LGBT+ inclusivity training, obtain her license, and continue working for Defendant CHESTNUT LANE, Plaintiff would have had to select Option 2 on the aforementioned interactive slide – i.e., "An LGBTQIA2S+ resident may feel unsafe and threatened if they heard this in their home facility." Plaintiff would have had to assert that the quoted Bible verse would make LGBT+ residents of CHESTNUT LANE feel unsafe and/or threatened, thereby disparaging her Christian faith, other Christians, and even God Himself.

81.     When Plaintiff refused to embrace Defendant ODHS' pro-LGBT+, anti-Christian orthodoxy, CHESTNUT LANE punished Plaintiff by suspending her without pay and ultimately firing her.  But for ODHS' demand for ideological conformity, as communicated to Plaintiff via both CHESTNUT LANE and Defendant OREGON CARE PARTNERS, Plaintiff would not have lost her job with CHESTNUT LANE.

82.     Defendants ODHS and OREGON CARE PARTNERS injured Plaintiff by forcing her to choose between her fidelity to her Christian faith and continued employment with Defendant CHESTNUT LANE. This, the Free Exercise Clause prohibits.

83.     Even assuming *arguendo* that the State of Oregon has a compelling interest in ensuring that LGBT+ APDs at long-term assisted living facilities receive "dignified, respectful, and discrimination-free care" [*see* Ex. "C"], the Free Exercise Clause requires the State to give neutral, respectful consideration to religious beliefs concerning LGBT+ conduct. Because the actions of Defendants ODHS and OREGON CARE PARTNERS here were by no means neutral or respectful toward Christians or Christianity, they would not pass strict scrutiny.

84.     The First Amendment also requires that any substantial burden government entities and state actors place on the free exercise of religion be narrowly tailored to meet its stated ends. To be narrowly tailored, state action must infringe on religious freedom as

minimally as possible. The actions of Defendants ODHS and OREGON CARE PARTNERS were not narrowly tailored here: ODHS and OREGON CARE PARTNERS could – and, in compliance with the Free Exercise Clause, should – have framed the offending slide from the LGBT+ inclusivity training in such a way that did not compel Plaintiff to disparage her Christian faith, other Christians, and even God Himself as a condition of licensure. Instead, they forced Plaintiff to choose between her faith and her employment.

85.    Based on the foregoing, Defendants ODHS and OREGON CARE PARTNERS have violated Plaintiff's freedom of religion under the First Amendment and should accordingly be held liable under 42 U.S.C. § 1983.

**FOURTH CAUSE OF ACTION:**
**DEPRIVATION OF FREEDOM OF SPEECH**
**[U.S. Const. amend. I; 42 U.S.C. § 1983]**
**Against Defendants OREGON CARE PARTNERS and ODHS**

86.    Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

87.    Under 42 U.S.C. § 1983, government entities like Defendant ODHS and state actors like Defendant OREGON CARE PARTNERS can be held liable for civil rights violations that arise out of a governmental or proprietary function.

88.    Moreover, as stated *supra*, private entities such as Defendant OREGON CARE PARTNERS are not entitled to Eleventh Amendment immunity and can be sued for damages.

89.    The U.S. Constitution's First Amendment, as applied to states through the Fourteenth Amendment, prohibits government entities like Defendant ODHS and state actors like Defendant OREGON CARE PARTNERS from depriving individuals of their freedom of speech. The Fourteenth Amendment prohibits state actors from "depriv[ing] any person of life, *liberty*, or property without due process of law."  U.S. Const. amend. XIV, § 1 (emphasis added).

90.    A government entity may violate an individual's free speech rights under the First Amendment by compelling her to communicate a message he does not wish to communicate.

91.    Moreover, the First Amendment's Free Speech and Free Exercise clauses work in tandem. In other words, when government entities like Defendant ODHS and state actors like Defendant OREGON CARE PARTNERS compel individuals to speak messages that go against their sincerely held religious beliefs, they violate both the Free Speech and the Free Exercise clauses.

92.    On top of that, as the Supreme Court has reaffirmed very recently, government entities like Defendant ODHS cannot condition grants of professional licenses upon individuals' willingness to speak the government's messages. *See*, e.g., *Chiles v. Salazar*, 2026 U.S. LEXIS 1565 (March 31, 2026); *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 778 (2018).

93.    Acting under color of state law, Defendant ODHS, acting both in its own capacity and via Defendant OREGON CARE PARTNERS, violated Plaintiff's constitutionally protected freedom of speech by requiring Plaintiff, as a condition of the licensure she needed to remain employed with Defendant CHESTNUT LANE, to disparage the Christian faith, other Christians, and perhaps even God Himself by declaring, via the "correct" response on the relevant slide, that the Bible verse quoted in the aforementioned interactive slide would make residents of CHESTNUT LANE who self-identify as LGBT+ feel unsafe or threatened. Such coercion, the First Amendment's Free Speech Clause prohibits.

94.    Based on the foregoing, Defendants ODHS and OREGON CARE PARTNERS have deprived Plaintiff of her constitutionally protected freedom of speech and should accordingly be held liable under 42 U.S.C. § 1983.

**FIFTH CAUSE OF ACTION:**
**CONSPIRACY TO VIOLATE CIVIL RIGHTS**
**[42 U.S.C. § 1985]**
**Against All Defendants**

95.    Plaintiff refers to and hereby incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

Complaint
19

96.     Title 42, § 1985(3) of the U.S. Code provides that where "two or more persons in any State" conspire to deprive an individual of "having and exercising any right or privilege of a citizen of the United States, the party so injured" may sue any one or more of the conspirators for damages.

97.     In this case, Defendant CHESTNUT LANE, in its capacity as Plaintiff's employer, conspired with Defendant OREGON CARE PARTNERS, in its capacity as Defendant ODHS' duly appointed administrator of the LGBT+ inclusivity training required for caregivers at long-term assisted living facilities as a condition of licensure and continued employment, to deprive Plaintiff of her freedoms of religion and speech, which are protected under both the U.S. and Oregon constitutions. See U.S. Const., amend. I and Ore. Const. art. I, §§ 2, 3, and 8.

98.     Had Defendant CHESTNUT LANE not terminated Plaintiff's employment due to her inability to complete the LGBT+ inclusivity training required by Defendant ODHS and administered by Defendant OREGON CARE PARTNERS without speaking a message that disparages her faith, other Christians, or possibly even God Himself, Plaintiff would like still be employed as a caregiver at CHESTNUT LANE and not suffered the economic and non-economic damages described above.

99.     Given the financial, mental, and emotional distress Plaintiff has suffered – which manifested itself in the physical symptoms described *supra* – due to Defendants' open hostility toward her Christian faith as well as her loss of employment, Defendants should be held liable for conspiring to deprive Plaintiff of her civil rights pursuant to 42 U.S.C. § 1985.

**REQUEST FOR DECLARATORY RELIEF**

100.     Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

101.     "The Declaratory Judgment Act, 28 U.S.C. § 2201, allows individuals to seek a declaration of the constitutionality of [a] disputed governmental action." *Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068, 1095 (D. Ore. 2013). "To issue a declaration, the Court

must address two conditions: (1) whether there is a case or controversy within [the Court's] jurisdiction; and (2) whether to exercise its jurisdiction." *Id.* (cleaned up) (internal quotation marks omitted).

102.    The LGBT+ inclusivity training mandated by Defendant ODHS and administered by Defendant OREGON CARE PARTNERS, which Plaintiff had to complete as a condition of continued employment with Defendant CHESTNUT LANE, demonstrates overt hostility toward religion – the Christian faith in particular. Such overt hostility, the First Amendment prohibits.

103.    Senate Bill 99, as applied to Plaintiff, and the LGBT+ inclusivity training, both on its face and as applied to Plaintiff, discriminate against speech based on its Christian ideology. Accordingly, Plaintiff seeks a declaration that the LGBT+ inclusivity training required for licensure of caregivers at long-term assisted living facilities in Oregon is unconstitutional under the First Amendment's Free Speech and Free Exercise clauses.

## REQUEST FOR INJUNCTIVE RELIEF

104.    Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

105.    Plaintiff requests that the Court preliminary and permanently enjoin Defendants ODHS and/or OREGON CARE PARTNERS to revise the LGBT+ inclusivity training to avoid invidiously stereotyping Christians in the name of protecting LGBT+ residents of long-term assisted living facilities from dignitary harm, and OREGON CARE PARTNERS to refrain from using the objectionable slide in any and all future versions of the LGBT+ inclusivity training when administering the training on ODHS' behalf.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

### ON ALL CAUSES OF ACTION:

1.    For economic, non-economic, and punitive damages from Defendants CHESTNUT LANE and OREGON CARE PARTNERS in amounts according to proof at trial;

2.      For declaratory and injunctive relief against Defendants ODHS and OREGON CARE PARTNERS;

3.      For attorney's fees and costs associated with bringing and maintaining this action in accordance with the law; and

4.      For such other and further relief as the Court may deem proper.


Dated: April 17, 2026                          PACIFIC JUSTICE INSTITUTE

                                               __/s/ RAY D. HACKE_____
                                               Ray D. Hacke
                                               Attorneys for Plaintiff
                                               KATHERINE G. TALMAN

# EXHIBIT "A"

OREGON SECRETARY OF STATE
► **Corporation Division**

HOME

Business Xpress | business name search | oregon business guide
license directory | business registry/renewal | forms/fees | notary public
uniform commercial code | uniform commercial code search | documents & data services

## Business Name Search

**New Search**     **Printer Friendly**     Business Entity Data     **03-31-2026 13:45**

| Registry Nbr | Entity Type | Entity Status | Jurisdiction | Registry Date | Next Renewal Date | Renewal Due? |
|---|---|---|---|---|---|---|
| 1355218-96 | DLLC | ACT | OREGON | 08-25-2017 | 08-25-2026 | |
| **Entity Name** | CHESTNUT LANE OPERATIONS, LLC | | | | | |
| **Foreign Name** | | | | | | |

**New Search**     **Printer Friendly**     Associated Names

| Type | PPB | PRINCIPAL PLACE OF BUSINESS | | |
|---|---|---|---|---|
| **Addr 1** | 1219 NE 6TH ST | | | |
| **Addr 2** | | | | |
| **CSZ** | GRESHAM | OR | 97030 | |
| | | | **Country** | UNITED STATES OF AMERICA |

*Please click here for general information about registered agents and service of process.*

| Type | AGT | REGISTERED AGENT | | **Start Date** | 05-25-2023 | **Resign Date** | |
|---|---|---|---|---|---|---|---|
| **Of Record** | 462580-83 | NATIONAL REGISTERED AGENTS, INC. | | | | | |
| **Addr 1** | 780 COMMERCIAL ST | | | | | | |
| **Addr 2** | STE 100 | | | | | | |
| **CSZ** | SALEM | OR | 97301 | | **Country** | UNITED STATES OF AMERICA | |

| Type | MAL | MAILING ADDRESS | | |
|---|---|---|---|---|
| **Addr 1** | 7632 SW DURHAM RD STE 105 | | | |
| **Addr 2** | | | | |
| **CSZ** | TIGARD | OR | 97224 | |
| | | | **Country** | UNITED STATES OF AMERICA |

| Type | MGR | MANAGER | | | | **Resign Date** | |
|---|---|---|---|---|---|---|---|
| **Name** | MARY | E | KOFSTAD | | | | |
| **Addr 1** | 25115 SW PARKWAY AVE STE B | | | | | | |
| **Addr 2** | | | | | | | |
| **CSZ** | WILSONVILLE | OR | 97070 | | **Country** | UNITED STATES OF AMERICA | |

**New Search**     **Printer Friendly**     Name History

| Business Entity Name | Name Type | Name Status | Start Date | End Date |
|---|---|---|---|---|
| CHESTNUT LANE OPERATIONS, LLC | EN | CUR | 08-25-2017 | |

Please read before ordering Copies.

**New Search**       **Printer Friendly**

## Summary History

| Image Available | Action | Transaction Date | Effective Date | Status | Name/Agent Change | Dissolved By |
|---|---|---|---|---|---|---|
| 📄 | AMENDED ANNUAL REPORT | 07-21-2025 | | FI | | |
| 📄 | AMENDED ANNUAL REPORT | 07-09-2024 | | FI | | |
| 📄 | AMENDED ANNUAL REPORT | 07-06-2023 | | FI | | |
| 📄 | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 05-25-2023 | | FI | | |
| 📄 | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 05-25-2023 | | FI | | |
| 📄 | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 05-25-2023 | | FI | Agent | |
| 📄 | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 07-22-2022 | | FI | Agent | |
| 📄 | AMENDED ANNUAL REPORT | 07-12-2022 | | FI | | |
| 📄 | AMENDED ANNUAL REPORT | 08-23-2021 | | FI | | |
| 📄 | AMENDED ANNUAL REPORT | 09-16-2020 | | FI | | |
| | ANNUAL REPORT | 08-21-2019 | | FI | | |
| 📄 | AMENDED ANNUAL REPORT | 08-24-2018 | | FI | | |
| 📄 | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 04-06-2018 | | FI | | |
| 📄 | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 03-27-2018 | | FI | | |
| | CHANGE OF REGISTERED AGENT/ADDRESS | 12-14-2017 | | FI | | |
| 📄 | ARTICLES OF ORGANIZATION | 08-25-2017 | | FI | Agent | |

---

About Us | Announcements | Laws & Rules | Feedback
Policy | SOS Home | Oregon Blue Book | Oregon.gov

For comments or suggestions regarding the operation of this site,
please contact : corporation.division@sos.oregon.gov

© 2026  Oregon Secretary of State.  All Rights Reserved.

# EXHIBIT "B"

OREGON SECRETARY OF STATE

## ▶ Corporation Division

HOME | Business Xpress | **business name search** | oregon business guide
license directory | business registry/renewal | forms/fees | notary public
uniform commercial code | uniform commercial code search | documents & data services

### Business Name Search

New Search     Printer Friendly     **Business Entity Data**     **04-07-2026 14:14**

| Registry Nbr | Entity Type | Entity Status | Jurisdiction | Registry Date | Next Renewal Date | Renewal Due? |
|---|---|---|---|---|---|---|
| 2467559-95 | DNP | ACT | OREGON | 09-15-2025 | 09-15-2026 | |
| **Entity Name** | OREGON CARE PARTNERS CAREGIVER TRAINING | | | | | |
| **Foreign Name** | | | | | | |
| **Non Profit Type** | PUBLIC BENEFIT | | | | | |

New Search     Printer Friendly     **Associated Names**

| Type | PPB | PRINCIPAL PLACE OF BUSINESS | | |
|---|---|---|---|---|
| Addr 1 | 11740 SW 68TH PARKWAY SUITE 250 | | | |
| Addr 2 | | | | |
| CSZ | PORTLAND | OR | 97223 | Country | UNITED STATES OF AMERICA |

*Please click here for general information about registered agents and service of process.*

| Type | AGT | REGISTERED AGENT | Start Date | 09-15-2025 | Resign Date | |
|---|---|---|---|---|---|---|
| Of Record | 049604-15 | THE OREGON HEALTH CARE ASSOCIATION, INC. | | | | |
| Addr 1 | 11740 SW 68TH PARKWAY SUITE 250 | | | | | |
| Addr 2 | | | | | | |
| CSZ | PORTLAND | OR | 97223 | Country | UNITED STATES OF AMERICA | |

| Type | MAL | MAILING ADDRESS | | |
|---|---|---|---|---|
| Not of Record | OREGON CARE PARTNERS CAREGIVER TRAINING. | | | |
| Addr 1 | 11740 SW 68TH PARKWAY SUITE 250 | | | |
| Addr 2 | | | | |
| CSZ | PORTLAND | OR | 97223 | Country | UNITED STATES OF AMERICA |

New Search     Printer Friendly     Name History

| Business Entity Name | Name Type | Name Status | Start Date | End Date |
|---|---|---|---|---|
| OREGON CARE PARTNERS CAREGIVER TRAINING | EN | CUR | 09-15-2025 | |

Please read before ordering Copies.

| New Search | Printer Friendly | Summary History |

| Image Available | Action | Transaction Date | Effective Date | Status | Name/Agent Change | Dissolved By |
|---|---|---|---|---|---|---|
| 📄 | ARTICLES OF INCORPORATION | 09-15-2025 | | FI | Name/Agent | |

About Us | Announcements | Laws & Rules | Feedback
Policy | SOS Home | Oregon Blue Book | Oregon.gov

For comments or suggestions regarding the operation of this site,
please contact : corporation.division@sos.oregon.gov

© 2026  Oregon Secretary of State.  All Rights Reserved.

# EXHIBIT "C"



## Oregon Department of Human Services

*Aging and People with Disabilities*
*Safety, Oversight and Quality*
PO Box 14530, Salem, OR 97309
Phone: (503) 373-2227
Fax (503) 378-8966

Tina Kotek, Governor

### ODHS-24-044-CBC-NF - Provider Alert

**Date:**      July 25, 2024

**To:**      All Nursing Facility Providers
All Assisted Living Providers
All Residential Care Providers

**From:**      Oregon Department of Human Services (ODHS), Aging and People with Disabilities (APD), Safety, Oversight and Quality (SOQ)

**Subject:**      Mandatory Training, Providing Inclusive Care Training for Oregon Long-Term Care Settings

In the 2023 legislative session, Senate Bill 99 was passed, creating a bill of rights for long-term care residents in Oregon who identify as LGBTQIA2S+ or live with HIV. All residents deserve dignified, respectful, and discrimination-free care.

Oregon Department of Human Services, Safety, Oversight, and Quality have developed training to meet Senate Bill 99 requirements. Training is mandatory for all Oregon long-term care setting administrators, staff and contractors providing care in Oregon licensed long-term care settings.

**All staff of APD licensed long-term care settings are required to take the training by December 31, 2024**. Training certificates are valid for 24 months from the date of completion; additional training is required every two years. A certificate of training completion is transferrable between care settings. **New staff with a start date of January 1, 2025, or later, must complete training before providing care.**

*"Assisting People to Become Independent, Healthy and Safe"*
An Equal Opportunity Employer

**Page 2 of 5**
**Provider Alert**
ODHS-24-044-CBC- NF

**Training is available online on August 1, 2024** through Oregon Care
Oregon Care Partners (OCP), learn more at:
https://oregoncarepartners.com/app/#/class-details/3726. The August 1, 2024,
training will be available in English with a Spanish translation training
available on November 1, 2024. There is no cost for the training, register here
now: OCP Class Details.

Please review the attached SOQ Providing Inclusive Care Online Training
Frequently Asked Questions (FAQs) for details about the OCP training and
training record requirements.

If you have questions, please email your licensing team at:

> NF.licensing@odhsoha.oregon.gov
CBC.Team@odhsoha.oregon.gov

Visit the Safety, Oversight and Quality website for program information.

# EXHIBIT "D"



ABOUT    CLASSES    CONTACT    KATHERINE TALM

MENU

Welcome ✓

Course Description ✓

Course Objectives ✓

Understanding Terminology ✓

LGBTQIA2S+ History in the U.S. and in Oregon ✓

Best Practices to Communicate with LGBTQIA2S+ Residents and Residents Living with HIV

## Reflection Questions for Lana

You hear the pastor quote a scripture, "If a man lies with a man as one lies with a woman, both of them have done what is detestable. They must be put to death; their blood will be on their own heads" (Leviticus 20:13).



Review Lana's Story

**How do you think an LGBTQIA2S+ resident would feel if they heard this in their home at the facility?**

**1** It doesn't matter. No LGBTQIA2S+ residents at your facility attend the church service anyway.

**2** An LGBTQIA2S+ resident may feel unsafe and threatened if they heard this in their home facility.

**3** An LGBTQIA2S+ resident probably wouldn't have any feelings about this since they've survived so much hardship anyway. Words can't really hurt.



# EXHIBIT "E"

Tuesday, November 12, 2024

Talman, Katherine G.   11/12/2024 10:32 PM

 

This training includes religious persecution against my faith which has been singled out.
If this slide is shown as an example against Christians,
I will bring it up with not only our head office, to our "speak up" board but I will be contacting a lawyer.

11/12/2024 10:33 PM

I can't see the training includes religious that you just sent the message.

Just saw your message with the picture on my personal

Talman, Katherine G.   11/12/2024 10:34 PM



I have sent you a text

11/12/2024 10:36 PM

Unfortunately, this training is mandated by the state of Oregon, not by the home office. We are required
to complete this training by the state of Oregon.

Talman, Katherine G.   11/12/2024 10:37 PM



I will be doing as said.
I will also not be attending the training.
This may end up going to the state

11/12/2024 10:37 PM

I am sorry that is affecting your faith. Okay. Thank you for letting me know.

Ex. 3 Page 1

# EXHIBIT "F"

10:24

 

2 People

Text Message
Yesterday 3:51PM

Hi Katherine, Renee and I reached out to HR about your concerns with the Oregon Care Partners training. They have confirmed that the State of Oregon has required this training for all staff who work in Assisted Living facilities. The training is mandatory per the States ruling and is a condition of employment. The official deadline is 12/31/24. You will have until then to take the training. If you decide not to take the training, then you would be terminated for failing to comply with the State required and mandated training.

Yesterday 9:09 PM

Katherine Talman

Thank you for reaching out to HR.
Yes, I am prepared to get fired for being subjected to a hostile work environment and being attacked fir my religious beliefs.

Text Message

Ex. 4 Page 1

# EXHIBIT "G"



**PJI**

ALBANY
NEW YORK

ATLANTIC CITY
NEW JERSEY

BILOXI
MISSISSIPPI

BOSTON
MASSACHUSETTS

CHICAGO
ILLINOIS

CINCINNATI
OHIO

DETROIT
MICHIGAN

HOUSTON
TEXAS

MIAMI
FLORIDA

MILWAUKEE
WISCONSIN

NEW YORK
NEW YORK

PHILADELPHIA
PENNSYLVANIA

RENO
NEVADA

SACRAMENTO
CALIFORNIA

SALEM
OREGON

SAN FRANCISCO
CALIFORNIA

SANTA ANA
CALIFORNIA

TRI CITIES
WASHINGTON

TUCSON
ARIZONA

WINSTON-
SALEM
NORTH
CAROLINA

December 13, 2024

**<u>VIA REGULAR MAIL & ELECTRONIC MAIL</u>**
Renée Rickard, Executive Director
E-mail: rrickard@avamerecommunities.com
Kellee Haddan, Business Office Manager
E-mail: khaddan@avameerecommunities.com
Avamere Living at Chestnut Lane
1219 NE 6th Street
Gresham, OR 97030

**Re: Katherine Talman**
**Employees' Rights Under Title VII of the Civil Rights Act**

Dear Ms. Rickard:

Ms. Katherine Talman contacted the Pacific Justice Institute ("PJI"), a non-profit law firm devoted to defending individuals' religious rights, about her current situation involving the mandated training entitled "Oregon Care Partners." PJI is writing to you because Ms. Haddan violated Title VII by failing to accommodate Ms. Talman's religious beliefs after she informed her employer that she cannot complete the required Oregon Care Partners training without compromising her religious beliefs. Kindly direct all correspondence related to this matter to the undersigned at the e-mail address below. Thank you.

**<u>Statement of Facts</u>**

Ms. Talman is a Christian who works at Avamere at Chestnut Lane as a Support Service Provider. Ms. Talman was told that as an employment requirement, Avamere/Arete Living is mandating she take the Oregon Care Partners training. Ms. Talman has several religious beliefs that conflict with this training because the training asserts or implies several falsehoods regarding Christianity generally or requires her to study and affirm what her faith regards to be heretical teachings. Some basic tenets of her beliefs that conflict with these false teachings in the "training" will be reviewed. First, Christians serve a God who loves His creation.[1] Second, we are not under the Old Testament Jewish law as Christ paid the price for all sin - past, present, and future - and came to fulfill the law.[2] Third, though we are no longer living as a slave to the law, there is still such a thing as moral right and wrong and Christians are not to take part in condoning or promoting evil.[3] Fourth, Christians are to love our neighbors and treat them with dignity and respect as part of God's creation, though this does not mean we affirm ideas and behaviors we believe to be harmful or against God's natural

---

[1] "For God so loved the world that he gave his one and only Son, that whoever believes in him shall not perish but have eternal life." John 3:16 NIV
[2] "But if you are led by the Spirit, you are not under the law." Galations 5:18 NIV
[3] "Abstain from all appearance of evil." 1 Thessalonians 5:22 KJV

*www.PJI.org*

中文 chinese.pji.org • 한국어 korean.pji.org • Русский russian.pji.org • Español spanish.pji.org

law and order.[4] These are all beliefs which are commonplace among many Christians, and Ms. Talman subscribes to these core beliefs as well.

Ms. Talman strongly objects to the "LGBTQIA2S+" content slide – a copy of which is attached hereto as **Exhibit "A"** – as an attempt to force her to change her religious beliefs regarding gender and human sexuality. Ms. Talman as a Christian believes in the natural law God has created for humans to be able to multiply and form families. This includes God's intended design for marriage being one man and one woman for life and two biological immutable sexes. She objects to the compelled violation of her religious beliefs by forced indoctrination of recent feminist and post-modern ideology and offending the Holy Spirit by actively studying practices which Christians view as sinful as an employment requirement. In addition, the slides in the exhibits openly mock Christianity and Judaism and promote heresy. The training slides discussing LGBTQ sexual preferences do not cover any job skill or relate to any legal standards or care standards for geriatric or disabled populations. Those slides seem purely to be for the purposes of changing the world view and conscience of those who are opposed to certain lifestyle choices for fundamentally religious reasons.

In light of this, Ms. Talman requested an accommodation to be exempt from finishing the training, which would require her to comply and promote sinful parts of our culture which are against the Christian faith. Complying with the training would further require her to play a part in the scheme of the writers of the training in mocking sacred scripture and ministers who preach the Old Testament who actually understand it, much unlike the writers of the training. She requested an accommodation to avoid the defilement of her mind with sinful ideologies.[5]

Both slides in the attached exhibits pose a religious conflict for Ms. Talman, but she more strongly objects to the slide quoting Leviticus out of context. This slide asks her to guess what a hypothetical resident who might have a LGBTQ lifestyle could think about a hypothetical sermon. Requiring Ms. Talman to view the slide attempting to define the LGBTQIA2S+ acronym and take part in the question-and-answer slide could force her into a material cooperation with evil. Requiring her to do so without permitting objection risks creating the appearance of her formal cooperation with evil. The slide with the verse from Leviticus also maliciously misapplies the Old Testament law for the ancient, theocratic nation of Israel to modern day America, which operates as a democratic republic. Ms. Talman objects to scripture being misused as a scare tactic to make Christians look hateful and threatening when almost no Christians believe we are living in a theocracy, in the geographic state of Israel, under the authority of the temple priests, while under the political rule of a king from the line of David. Ms. Talman is concerned that the provided answer choices expressly or impliedly make assertions with which she disagrees. This slide in practice uses an old-fashioned 'straw man' type argumentation in each of the three answer

---

[4] 'Jesus replied: "Love the Lord your God with all your heart and with all your soul and with all your mind." This is the first and greatest commandment. And the second is like it: "Love your neighbor as yourself." All the Law and the Prophets hang on these two commandments.' Matthew 22:37-40 NIV

[5] "Do not conform to the pattern of this world, but be transformed by the renewing of your mind. Then you will be able to test and approve what God's will is—his good, pleasing and perfect will." Romans 12:2 NIV

2

choices, all of which are equally offensive, in addition to the misapplication and misinterpretation of scripture.

This letter will review how each response is offensive and conflicts with her religious beliefs as a practicing Christian. After the quote from Leviticus, the question on the slide says, "How do you think an LGBTQIA2S+ resident would feel if they heard this in their home at the facility?" *See* Attached **Exhibit "B."** From a sheer logic perspective, none of the responses provided do not make sense in light of the question being asked. Ms. Talman objects to the misapplication of scripture, the offensive hypothetical making a mockery of pastors, and being forced to select a pre-determined response directly contradictory to her faith and to an already offensive question.

Response #1: "It doesn't matter. No LGBTQIA2S+ residents at your facility attend the church service anyway." Ex. B.  This answer is problematic because it forces Ms. Talmon to speak or affirm that she assumes that no minister coming into the facility can properly preach out of the Old Testament with the right motive without offending or threatening someone living a LGBTQ lifestyle. Two, it implies also that if someone were to choose this answer that they would never expect to see someone with these views at a church service or that someone with these tendencies would not be interested in religious instruction. Three, it also implies if the person selects this option that they are apathetic about difficult passages of scripture being misused by a speaker to potentially preach condemnation and act in a menacing way towards others. There are many problems with this answer choice such that she cannot in good conscience select it.

Response # 2: "An LGBTQIA2S+ resident may feel unsafe and threatened if they heard this in their home facility." Ex. B. Again, this answer forces the person to make an assumption about how another individual might feel. Here, this answer choice implies the person answering anticipates the speaker or pastor must intend physical harm by preaching through the Mosaic law. This is offensive to Christians, Jews, and other religions that hold the Bible as a sacred text. That the state of Oregon, the writers of this training, and Avamere would try to imply pastors and ministers that use the Bible want their hearers to feel threatened with physical harm is an absurd notion and an incredibly dangerous presumption to make and should not be tolerated under any law. Ms. Talman has an issue with any wording or training that requires her to presume any minister or rabbi preaching through the Old Testament has criminal intent. She also strongly disagrees with the intentional misuse of verses of the Bible that would require her to paint God and those who believe in Yahweh as anything other than an all-loving but righteous God.

Response #3: "An LGBTQIA2S+ resident probably wouldn't have any feelings about this since they've survived so much hardship anyway. Words can't really hurt." This answer is incredibly presumptuous both about the person selecting the answer and the hypothetical resident. If Ms. Talman were to select this answer choice it would be affirming those in the LGBT lifestyle have no feelings and can't be hurt by harsh words. That is ridiculous and the wording is designed to make someone who selects this choice appear to have a total lack of empathy. It also assumes that just because someone is in this community they have "survived

3

so much," clearly showing the bias on behalf of the drafters of this training. The ending is equally offensive to Christians who believe that words greatly matter and God that gave us the ability to speak for a reason which is to praise Him and affirm truth and have relationships with others.[6]

All the answers to this question loaded with anti-Christian assumptions on this slide have many implications which are highly offensive to Ms. Talman and would be to other Christians as well in each of these answer choices. In short, they are all trickery to get someone to pick a choice which essentially labels Christians and others who believe the Bible as bigots or potentially physically threatening and are incredibly biased and inherently anti-Christian. Ms. Talman's faith, of course, forbids her from so slandering her fellow brothers and sisters in Christ.

As can be seen all of these are highly offensive to Ms. Talman and she believes selecting any of these choices in response would be affirming statements which speak negatively about God and imply horrible disgusting things about ministers. Avamere, the state of Oregon, and the content creator should be ashamed. As a proposed accommodation, Ms. Talman would be happy to discuss her values regarding treating everyone with love and respect in a pluralistic society (though this training does not hold to that same standard) with management. She also would be willing to take a Christian version of diversity training in which Christian values of equality under God and love and service for fellow man are discussed in a healthcare context.

**Legal Discussion**

"[T]he Free Exercise and Free Speech Clauses of the [U.S. Constitution's] First Amendment … work in tandem." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (*Kennedy*). The same is true of the religious freedom and free speech provisions of the Oregon Constitution, which protect the freedoms of religion and speech to an even greater degree than the First Amendment does. *See* Or. Const. art. I, §§ 2 and 3 [concerning freedom of religion] and 8 [concerning freedom of speech]. Article I, § 3 of the Oregon Constitution in particular declares, "***No law shall in any case whatever*** control the free exercise, and enjoyment of religious [sic] opinions, or interfere with the rights of conscience" (emphasis added). Article I, § 8, meanwhile, makes clear that "[n]o law shall be ***passed restraining the free exercise of opinion, or restricting the right to speak, write or print freely on any subject whatever***" (emphasis added). These protections were the backdrop Congress had in mind when it passed the Civil Rights Act. "I think in the Civil Rights Act we thus intended to protect the same rights in private employment as the Constitution protects in Federal, State or local governments." Riley v. Bendix Corp., 464 F.2d 1113, 1116 (5th Cir. 1972) *quoting* the Senate Record from Senator Randolph.

Ms. Talman, as an employee, is protected under Title VII of the United States Code against employment discrimination based on her religion: "It shall be an unlawful

---

[6] "For, Whoever would love life and see good days must keep his tongue from evil and his lips from deceitful speech." 1 Peter 3:10 BSB.

4

employment practice for an employer to … ***<u>discharge</u>*** any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, *conditions*, or privileges of employment, because of such individual's … ***<u>religion</u>***… which would … otherwise adversely affect his status as an employee, *because of* such individual's … religion." 42 U.S.C.A. § 2000e-2 (a)(1)-(2) (emphasis added). The text of Title VII makes plain that Ms. Talman cannot have her employment terminated because of her religion, which forbids her from taking part in a training which makes a mockery of Christians and the Bible. 'The term "religion" includes ***<u>all</u>*** ***<u>aspects</u>*** of religious observance and practice, *as well as belief*, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.'" 42 U.S.C.A. § 2000e(j) (emphasis added).

EEOC regulations also follow this process and mandate that the employer and employee engage in an interactive process to resolve the conflict between the employee's religious beliefs and the employment requirement or policy at issue. "After an employee or prospective employee notifies the employer or labor organization of his or her need for a religious accommodation, the employer or labor organization has an obligation to reasonably accommodate the individual's religious practices. A refusal to accommodate is justified *only* when an employer or labor organization can demonstrate that *an undue hardship would in fact result* from each available alternative method of accommodation." 29 C.F.R. § 1605.2 (c)(1) (emphasis added). "Undue hardship" appropriately understood by employers means "… substantial increased costs in relation to the conduct of its particular business." 42 U.S.C.A. § 2000e(j); *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). Here, Avamere will not be able to prove undue hardship because it will not be able to show any cost to its operations from allowing her to be exempt from this training because the mandate allows for observance of federal law.

The law which mandates this training (SB 99) leaves the door open for entities to otherwise comply with conflicting and superseding federal law, such as Title VII. The Oregon legislature included a clause in the new bill which allows care homes to remain in compliance with existing federal law for situations such as this where the training mandate or the pronoun/speech mandate conflicts with a federal statute like Title VII.[7] "Any requirement in sections 2 to 8 of this 2023 Act *may not* be applied to a care facility if the requirement is *incompatible with: … A state or federal statute*, federal regulation or administrative rule that applies to the care facility." 82nd Oregon Legislative Assembly – 2023 Regular Session, Senate Bill 99, Section 8 (2), (emphasis added). The portion of the law which requires this training is in violation of Title VII if it results in religious discrimination. Though not mentioned in ODHS-24-044-CBC-NF, the text of the law clearly makes provision for maintaining the Title VII rights of those who work in assisted living communities. Also, the law required compliance by December 31, 2024, absent conflicts with federal law notwithstanding. We therefore ask that as a bare minimum, Ms. Talman be allowed to work until the state deadline.

---

[7] https://olis.oregonlegislature.gov/liz/2023R1/Downloads/MeasureDocument/SB0099/Enrolled

5

Cases ongoing in the District Court of Oregon are applying recent mammoth Supreme Court precedent from *Kennedy, Groff, and Muldrow*, and are recognizing or reaffirming that failure-to-accommodate is a viable form of religious discrimination via disparate treatment under Title VII. *See White v. Columbia Sportswear Co.,* No. 3:24-CV-00006-SB, 2024 WL 5080032 at *8 (D. Or. Oct. 28, 2024) [court denying motion to dismiss on behalf of the employer where plaintiff pled plausible religious belief, which conflicted with an employment requirement, and she was subsequently terminated]; *Welch v. Oregon Health & Sci. Univ.*, No. 3:23-CV-01231-SB, 2024 WL 3106930, at *11 (D. Or. May 17, 2024), *report and recommendation adopted,* No. 3:23-CV-01231-SB, 2024 WL 3106838 (D. Or. June 20, 2024) [court again denying motion to dismiss on behalf of an employer where plaintiffs established prima facie case and there was no evidence of undue hardship on behalf of the employer]; *Trinh v. Shriners Hosps. for Child.*, No. 3:22-CV-01999-SB, 2024 WL 4378963, at *24 (D. Or. Aug. 9, 2024), *report and recommendation adopted as modified,* No. 3:22-CV-01999-SB, 2024 WL 4356501 (D. Or. Sept. 27, 2024) [denying summary judgment and a motion to dismiss on behalf of the employer based on recent Ninth Circuit decisions applying recent Supreme Court guidance]; *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978) [finding that the employer's lack of any effort to accommodate the employee's sincere religious objections to joining a union, violated Title VII]; EEOC *v. Hanson-Loran Co.*, 21 F.3d 1112 (9th Cir. 1994) [denying summary judgment where employer did not adequately accommodate employee's need for time off to observe the Sabbath "where there is a factual dispute as to whether the failure to accommodate was the result of business exigency or discriminatory animus"]. These cases show that the Ninth Circuit is taking updated guidance on Title VII seriously and will thoroughly examine complaints alleging failure to accommodate as part of a disparate treatment theory.

## **Summary and Demand**

The slides regarding LGBTQIA2S+ ideology are troubling to Ms. Talman because it forces her to "speak" messages that violate her faith as a Christian as a condition for continued employment. Both of the slides express or imply that God is anything other than an all-loving God and Christians should or could be considered threatening based on their beliefs of marriage and human sexuality. Ms. Talman should be exempt from the training to avoid a conflict with those presuppositions and her own religious beliefs including Jesus's command to love our neighbor, natural sexual relations and marriage are between one man and one woman, and sex is a biological, God-determined, immutable characteristic. An employer under Title VII cannot force its employees to check their religious beliefs upholding the natural law at the door to avoid termination. While many ideals often do not play out in our culture, that is not a reason to force her to violate her religiously informed conscience by taking this training.

In enforcing Senate Bill 99's unconstitutional mandatory training provision against Ms. Talman, Ms. Rickard has placed Avamere at Chestnut Lane – and, by extension, Arete Living – in a very actionable position.  Regardless, Ms. Talman wishes to avoid the financial, mental, and emotional burden of taking this case to trial.  Accordingly, PJI hereby demands that Avamere avoid terminating Ms. Talman and provide her an exemption from this

6

training, or provide a reasonable accommodation, possibly in the form of an alternative instruction which does not compel LGBTQIA2S+ viewpoints.

Please contact the undersigned at the e-mail address below by 5 p.m. December 15, 2024, to indicate whether Avamere at Chestnut Lane and Arete will comply with Title VII's requirements to accommodate, and not discriminate, based on religious beliefs.

Sincerely,

*Ray D. Hacke*

PACIFIC JUSTICE INSTITUTE
Attorney at Law
Tel: (503) 917-4409
E-mail: rhacke@pji.org

CC: Oregon Department of Human Services
Aging and People with Disabilities
Safety, Oversight and Quality
PO Box 14530, Salem, OR 97309
Phone: (503) 373-2227
Fax (503) 378-8966

7

# EXHIBIT "H"

3:13



2 People

Text Message • SMS
Thu, Jan 2 at 2:58 PM

Renee Rickard

Hello,
I spoke with Warren, the policy analyst, regarding the mandatory training from Oregon Care Partners earlier today. Unfortunately, it has been determined that providing inclusive care is a mandatory training requirement under OARs and is mandated by law. You will need to request a religious exemption from DHS for this specific training. In the meantime, we will have to suspend you effective immediately, pending the approval of the exemption.
If the religious exemption is not approved by DHS, we will proceed with termination. You will have one week to secure the exemption.
Thank you.

Today 2:25 PM

Renee Rickard

 Text Message • SMS

# EXHIBIT "I"

82nd OREGON LEGISLATIVE ASSEMBLY--2023 Regular Session

## Enrolled

# Senate Bill 99

Printed pursuant to Senate Interim Rule 213.28 by order of the President of the Senate in conformance with presession filing rules, indicating neither advocacy nor opposition on the part of the President (at the request of Senate Interim Committee on Human Services, Mental Health and Recovery)

CHAPTER .................................................

AN ACT

Relating to aging adults; creating new provisions; and amending ORS 410.320.

**Be It Enacted by the People of the State of Oregon:**

**BILL OF RIGHTS FOR LGBTQIA2S+ OLDER ADULT RESIDENTS
OF LONG TERM AND COMMUNITY-BASED CARE FACILITIES**

**SECTION 1. Sections 2 to 8 of this 2023 Act are added to and made a part of ORS 441.015 to 441.087.**

**SECTION 2. As used in sections 2 to 8 of this 2023 Act:**

**(1) "Care facility" includes:**

**(a) A long term care facility;**

**(b) A residential care facility, including an assisted living facility, as defined in ORS 443.400; and**

**(c) An adult foster home, as defined in ORS 443.705.**

**(2) "Gender expression" means an individual's gender-related appearance and behavior, whether or not these are stereotypically associated with the sex the individual was assigned at birth.**

**(3)(a) "Gender identity" means an individual's internal, deeply held knowledge or sense of the individual's gender, regardless of physical appearance, surgical history, genitalia, legal sex, sex assigned at birth or name and sex as it appears in medical records or as it is described by any other individual, including a family member, conservator or legal representative of the individual.**

**(b) "Gender identity" means the gender identity last expressed by an individual who lacks the present ability to communicate.**

**(4) "Gender nonconforming" means having a gender expression that does not conform to stereotypical expectations of one's gender.**

**(5) "Gender transition" means a process by which an individual begins to live according to that individual's gender identity rather than the sex the person was assigned at birth. The process may include changing the individual's clothing, appearance, name or identification documents or undergoing medical treatments.**

**(6) "Harass" or "harassment" includes:**

(a) To act in a manner that is unwanted, unwelcomed or uninvited, that demeans, threatens or offends a resident and results in a hostile environment for a resident.

(b) To require a resident to show identity documents in order to gain entrance to a restroom or other area of a care facility that is available to other individuals of the same gender identity as the resident.

(7) "LGBTQIA2S+" means lesbian, gay, bisexual, transgender, queer, intersex, asexual, Two Spirit, nonbinary or other minority gender identity or sexual orientation.

(8) "Resident" means a resident or a patient of a care facility.

(9) "Sexual orientation" means romantic or sexual attraction, or a lack of romantic or sexual attraction, to other people.

(10) "Staff" or "staff person" means one or more individuals who:

(a) Are employed by a care facility to provide services or supports directly to residents; or

(b) Contract with or are employed by an entity that contracts with the care facility to provide services or supports directly to residents.

(11) "Transgender" means having a gender identity or gender expression that differs from the sex one was assigned at birth, regardless of whether one has undergone or is in the process of undergoing gender-affirming care.

SECTION 3. (1) A care facility and the staff of the facility may not take any of the following actions based in whole or in part on a resident's actual or perceived sexual orientation, gender identity, gender expression or human immunodeficiency virus status:

(a) Deny admission to a care facility, transfer or refuse to transfer a resident within a facility or to another facility or discharge or evict a resident from a facility;

(b) Deny a request by a resident to choose the resident's roommate, when a resident is sharing a room;

(c) If rooms are assigned by gender, assign, reassign or refuse to assign a room to a transgender or other LGBTQIA2S+ resident other than in accordance with the resident's gender identity, unless at the request of the resident or if required by federal law;

(d) Prohibit a resident from using, or harass a resident who seeks to use or does use, a restroom that is available to other individuals of the same gender identity as the resident, regardless of whether the resident is making a gender transition, has taken or is taking hormones, has undergone gender affirmation surgery or presents as gender nonconforming;

(e) Repeatedly and willfully refuse to use a resident's chosen name or pronouns after being reasonably informed of the resident's chosen name or pronouns;

(f) Deny a resident the right to wear or be dressed in clothing, accessories or cosmetics, or to engage in grooming practices, that are permitted to any other resident;

(g) Restrict a resident's right to associate with other residents or with visitors, including the resident's right to consensual sexual relations or to display physical affection, unless the restriction is uniformly applied to all residents in a nondiscriminatory manner;

(h) Deny or restrict medical or nonmedical care that is appropriate to a resident's organs and bodily needs, or provide medical or nonmedical care that, to a similarly situated, reasonable person, unduly demeans the resident's dignity or causes avoidable discomfort;

(i) Fail to accept a resident's verbal or written attestation of the resident's gender identity or require a resident to provide proof of the resident's gender identity using any form of identification;

(j) Fail to take reasonable actions, within the care facility's control, to prevent discrimination or harassment when the facility knows or should have known about the discrimination or harassment; or

(k) Refuse or willfully fail to provide any service, care or reasonable accommodation to a resident or an applicant for services or care.

**(2)** A care facility shall include in its current nondiscrimination policy and in its written materials providing notice of resident rights pursuant to ORS 441.605, and in all places and on all materials where that policy or those written materials are posted, the following notice:

_____

(Name of care facility) does not discriminate and does not permit discrimination, including but not limited to bullying, abuse or harassment, based on an individual's actual or perceived sexual orientation, gender identity, gender expression or human immunodeficiency virus status, or based on an individual's association with another individual on account of the other individual's actual or perceived sexual orientation, gender identity, gender expression or human immunodeficiency virus status. If you believe you have experienced this kind of discrimination, you may file a complaint with the Department of Human Services at _____ (provide current contact information).

_____

**SECTION 4.** (1) A care facility shall implement procedures regarding resident records generated at the time of admission and during the resident's stay to ensure that the records include the resident's gender identity and the resident's chosen name and pronouns, as indicated by the resident.

(2) Unless required by state or federal law, a care facility shall not disclose any personally identifiable information regarding:

(a) A resident's sexual orientation;

(b) Whether a resident is LGBTQIA2S+;

(c) A resident's gender transition status; or

(d) A resident's human immunodeficiency virus status.

(3) A care facility shall take appropriate steps to minimize the likelihood of inadvertent or accidental disclosure of information described in subsection (2) of this section to other residents, visitors or facility staff, except to the minimum extent necessary for facility staff to perform their duties.

(4) Informed consent shall be required in relation to any nontherapeutic examination or observation of, or treatment provided to, a resident.

(5) A transgender resident shall be provided access to any assessments, therapies and treatments that are recommended by the resident's health care provider, including but not limited to transgender-related medical care, hormone therapy and supportive counseling.

**SECTION 5.** A care facility that violates the provisions of sections 2 to 8 of this 2023 Act, or that employs a staff member who violates the provisions of sections 2 to 8 of this 2023 Act, shall be subject to civil penalties or other administrative action as may be provided under ORS 441.705 to 441.745 and rules adopted by the Department of Human Services. Sections 2 to 8 of this 2023 Act may not be construed to limit the ability to bring any civil, criminal or administrative action for conduct constituting a violation of any other provision of law.

**SECTION 6.** (1) A care facility shall ensure that the administrators and staff employed by the facility receive training, as part of the facility's preservices or continuing education required by law, concerning:

(a) Caring for LGBTQIA2S+ residents and residents living with human immunodeficiency virus; and

(b) Preventing discrimination based on a resident's sexual orientation, gender identity, gender expression or human immunodeficiency virus status.

(2) At a minimum, the training required by subsection (1) of this section must include:

(a) The defined terms commonly associated with LGBTQIA2S+ individuals and human immunodeficiency virus status;

(b) Best practices for communicating with or about LGBTQIA2S+ residents and residents living with human immunodeficiency virus, including the use of an individual's chosen name and pronouns;

(c) A description of the health and social challenges historically experienced by LGBTQIA2S+ residents and residents living with human immunodeficiency virus, including discrimination when seeking or receiving care at care facilities and the demonstrated physical and mental health effects within the LGBTQIA2S+ community associated with such discrimination; and

(d) Strategies to create a safe and affirming environment for LGBTQIA2S+ residents and residents living with human immunodeficiency virus, including suggested changes to care facility policies and procedures, forms, signage, communication between residents and their families, activities, in-house services and staff training.

(3) The Department of Human Services shall establish by rule a process for a care facility to request approval of the training provided by the facility under this section. The department shall approve a training no later than 90 days after the date of request if:

(a) The care facility submits:

(A) A statement of the qualifications and training experience of the individual or entity providing the training;

(B) The proposed methodology for providing the training either online or in person;

(C) An outline of the training; and

(D) Copies of the materials to be used in the training;

(b) The training meets the requirements of subsections (1) and (2) of this section; and

(c) The individual or entity providing the training demonstrates a commitment to advancing quality care for LGBTQIA2S+ residents and residents living with human immunodeficiency virus in this state.

(4) A care facility shall designate two employees, one who represents management at the facility and one who represents direct care staff at the facility, to receive the training described in subsections (1) and (2) of this section within 12 months of being designated and every two years thereafter. The designated employees shall serve as points of contact for the facility regarding compliance with sections 2 to 8 of this 2023 Act and shall develop a general training plan for the facility. In the event a designated employee ceases to be employed by the facility, the facility shall designate another employee, who is representative of the employee group represented by the former designee and who shall complete the training required by subsections (1) and (2) of this section, to serve as a point of contact for the facility regarding compliance with sections 2 to 8 of this 2023 Act and to have joint responsibility for the facility's training plan.

(5) Within 12 months of hiring and every two years thereafter, a care facility shall provide to administrators and staff employed by the facility the training described in subsections (1) and (2) of this section. Training provided subsequent to the initial training of an administrator or staff person employed by the facility must include, at a minimum, refresher courses on the topics described in subsection (2)(b) and (d) of this section.

(6) A care facility shall retain records documenting the completion of the training required by subsections (1) and (2) of this section by each administrator and staff member at the facility. The records shall be made available, upon request, to the Department of Human Services and the office of the Long Term Care Ombudsman.

(7) A care facility is responsible for the cost of providing the training required by this section to each administrator and staff person employed by the facility.

SECTION 7. (1) An entity that contracts with a care facility to provide services or supports directly to residents of the care facility shall provide to the entity's staff persons who provide the services or supports training meeting the requirements in section 6 (1) and (2) of this 2023 Act. The entity shall provide the training within 12 months of entering into the

contract with the care facility and every two years thereafter. The entity shall provide the training to a newly hired staff person no later than 12 months after hiring.

(2) An individual who contracts with a care facility to provide services or supports directly to residents of the care facility shall complete a training that meets the requirements of section 6 (1) and (2) of this 2023 Act no later than 12 months after entering into a contract with the facility and every two years thereafter.

(3) Training provided subsequent to the initial training of an individual or of a staff person employed by the entity must include, at a minimum, refresher courses on the topics described in section 6 (2)(b) and (d) of this 2023 Act.

(4) The contracting individual or entity shall bear the cost of the training required by this section.

SECTION 8. Any requirement in sections 2 to 8 of this 2023 Act may not be applied to a care facility if the requirement is incompatible with:

(1) The professionally reasonable clinical judgment of the management or staff of the care facility; or

(2) A state or federal statute, federal regulation or administrative rule that applies to the care facility.

SECTION 9. The Long Term Care Ombudsman, the deputy ombudsmen and their designees shall complete a training meeting the requirements of section 6 (1) and (2) of this 2023 Act within 12 months of appointment and every two years thereafter. Training provided subsequent to the initial training of the Long Term Care Ombudsman, the deputy ombudsmen and their designees must include, at a minimum, refresher courses on the topics described in section 6 (2)(b) and (d) of this 2023 Act.

SECTION 10. The Director of Human Services shall adopt rules in accordance with ORS chapter 183 as necessary to implement the provisions of sections 2 to 8 of this 2023 Act.

SECTION 11. The training described in:

(1) Section 6 (1) and (2) of this 2023 Act shall first be provided to administrators and staff employed by a care facility, individuals and staff employed by entities that contract with a care facility to provide services or supports directly to residents of the care facility and the Long Term Care Ombudsman, the deputy ombudsmen and their designees no later December 31, 2024.

(2) Section 6 (4) of this 2023 Act shall first be provided no later than July 1, 2024.

### LGBTQIA2S+ SUBCOMMITTEE OF THE GOVERNOR'S COMMISSION ON SENIOR SERVICES

SECTION 12. ORS 410.320 is amended to read:

410.320. (1)(a) The Governor's Commission on Senior Services is created. The commission shall consist of at least 21 members appointed by the Governor for terms of three years.

[(2)] (b) Prior to making appointments, the Governor shall request and consider recommendations from the area agencies [on aging] and other interested senior organizations. The Governor shall designate a member to serve at the pleasure of the Governor as chairperson for a term of two years with such duties as the Governor shall prescribe. The membership of the commission shall be composed of persons broadly representative of major public and private agencies who are experienced in or have demonstrated particular interest in the special needs of elderly persons, including persons who have been active in organizations and advocates on behalf of elderly persons. Additionally, membership shall include persons who are active in advocacy organizations representing the interests of persons with disabilities who are served in programs under the Department of Human Services and consumers of services provided primarily to elderly persons and persons with disabilities under department programs, including low income persons, minorities and persons with disabilities. At least a majority of members shall be 60 years of age or older.

[(3)] **(c)** The Governor's Commission on Senior Services shall advise the Governor and the Director of Human Services on needs of elderly persons, and recommend actions by the Governor, the Department of Human Services, other governmental entities and the private sector, appropriate to meet such needs.

[(4)] **(d)** The commission shall have authority to study programs and budgets of all state agencies that affect elderly persons. After such study, the commission shall make recommendations to the Governor and to the agencies involved. Such recommendations shall be designed to provide coordination of programs for elderly persons, to avoid unnecessary duplication in provision of services, and to point out gaps in provision of services. The commission shall also recommend development of a comprehensive plan for delivery of services to elderly persons. In carrying out these tasks, the commission shall coordinate its efforts with other advisory groups within the Department of Human Services to avoid duplication of effort.

[(5)] **(e)** The commission shall promote responsible statewide advocacy for elderly persons.

[(6)] **(f)** Members of the commission, other than legislators, shall be entitled to compensation and expenses as provided in ORS 292.495.

**(2)(a) The LGBTQIA2S+ subcommittee of the Governor's Commission on Senior Services is established. The intent of the Legislative Assembly in establishing the subcommittee is to:**

**(A) Work to improve state agency interactions and communication with, and support of, the LGBTQIA2S+ community; and**

**(B) Create advocacy opportunities for, and support equity for, LGBTQIA2S+ older adults throughout state government.**

**(b) The purpose of the subcommittee is to advise the Governor and the director or the director's designee on the needs of LGBTQIA2S+ older adults and on how to improve the delivery of services to meet the needs of LGBTQIA2S+ older adults.**

**(c) The Governor shall appoint nine members to the subcommittee after requesting and considering recommendations from the department, area agencies and organizations that serve or represent the LGBTQIA2S+ community.**

**(d) At least five members of the subcommittee must be individuals who identify as LGBTQIA2S+, including at least one member who identifies as transgender.**

**(e) Members appointed to the subcommittee must be supportive of the intent of the Legislative Assembly in establishing the subcommittee.**

**(f) Members of the subcommittee serve for a term of three years and may be reappointed.**

**(g) Members of the subcommittee are not entitled to compensation, but at the discretion of the commission may be reimbursed for actual and necessary travel and other expenses reasonably incurred by the members in the performance of the official duties in the amount and manner provided in ORS 292.495.**

**(h) As used in this section, "LGBTQIA2S+" means lesbian, gay, bisexual, transgender, queer, intersex, asexual, Two Spirit, nonbinary or other minority gender identity or sexual orientation.**

**SECTION 13. The Governor shall appoint the members of the LGBTQIA2S+ subcommittee of the Governor's Commission on Senior Services no later than September 1, 2024.**

## CAPTIONS

**SECTION 14. The unit captions used in this 2023 Act are provided only for the convenience of the reader and do not become part of the statutory law of this state or express any legislative intent in the enactment of this 2023 Act.**

————————

**Passed by Senate June 20, 2023**

................................................................
Lori L. Brocker, Secretary of Senate

................................................................
Rob Wagner, President of Senate

**Passed by House June 22, 2023**

................................................................
Dan Rayfield, Speaker of House

**Received by Governor:**

........................M.,........................................................, 2023

**Approved:**

........................M.,........................................................, 2023

................................................................
Tina Kotek, Governor

**Filed in Office of Secretary of State:**

........................M.,........................................................, 2023

................................................................
Secretary of State

# EXHIBIT "J"

# Providing Inclusive Care: Training for Long-Term Care Facility Staff

## Frequently Asked Questions

In the 2023 legislative session, Senate Bill 99 was passed, creating a bill of rights for long-term care residents in Oregon who identify as LGBTQIA2S+ or live with HIV. These residents deserve dignified, respectful, and discrimination-free care.

Oregon Department of Human Services, Safety, Oversight, and Quality have developed training to meet Senate Bill 99 requirements. Training is mandatory for all Oregon long-term care setting owners, staff, and contractors providing care in Oregon licensed long-term care settings.

All staff of APD licensed long-term care settings are required to take the training by December 31, 2024. Training certificates are valid for 24 months from the date of completion; additional training is required every two years. A certificate of training completion is transferrable between care settings. New staff with a start date of January 1, 2025, or later, must complete training before providing care.

### Answers to Frequently Asked Questions About the Mandatory Training

**When is the training available?** Training is available online on August 1, 2024. The August 1, 2024, training will be available in English with a Spanish translation training available on November 1, 2024.

**Where can I get training?** APD worked with Oregon Care Partners (OCP) to develop an online training, which is the most accessible, and convenient option.

**Where can I find more information about the OCP training.** Details about the no cost training Oregon Care Partners training are available at: https://oregoncarepartners.com/app/#/class-details/3726.

**Where can I register for the Oregon Care Partners training?** Register for the training at: OCP Class Details.


Oregon Department of Human Services

**Who is required to take the training?** All facility administrators and staff working in long-term care facilities, including kitchen, housekeeping, and direct care providers, as well as contractors working in these settings.

**Why is this training necessary?** To ensure that all staff are equipped to provide safe, respectful, and inclusive care for LGBTQIA2S+ residents and those living with HIV, as mandated by Senate Bill 99. This training promotes a welcoming environment where all residents can feel valued and respected, free from discrimination.

**Is training mandatory?** Yes, all long-term care facility staff, including owners, administrators, and direct care providers, are required to complete this training.

**Who is required to take the training?** All staff members at long-term care facilities, including kitchen, housekeeping, and direct care providers, as well as contractors working in these settings.

**What is the deadline for completing this mandatory training?** All staff must complete training by December 31, 2024.

**How long is the training?** The training approximately 1.5 hours in length.

**Will CEUs or training hours be offered?** Yes, continuing education units (CEUs) or training hours will be provided upon completion of the training. Training certificates are valid for 24 months and transferrable between facilities.

**How do I access the online training?** You will need to create an account on the OCP website with your name, email address, and care setting information. By taking the training individually, you will retain your transferrable training records. Link: https://oregoncarepartners.com/app/#/class-details/3726

**Are group training sessions possible?** Yes, group training sessions are allowed. While the OCP training was created to be taken individually, providers may opt to hold a group training (e.g., as an all-staff meeting). When possible, the Administrator or owner should be the one who creates the OCP account, allowing staff to watch the training as a group.

)( Oregon Department
of Human Services

**If staff attend a group training, will they be able to get a certificate of completion from OCP?** No. The OCP system is designed for individual trainees to create their own account and complete the training online to obtain a certificate of completion. If an individual wants a certificate of completion, they must create their own account and take the training **online.**

**May staff from multiple locations attend the same group training?**

Yes. Providers with multiple locations may have their staff attend an in-person group training or a virtual group training. **Note:** To receive credit for taking the training, participants must complete the entire training.

**What are the requirements for group trainings?** For in-person group training, a sign-in sheet with the names, titles, and signatures of attendees is required. For virtual group training, an attendance report must be kept.

**Do providers need to keep training records?** Yes. Providers must retain all training records and be prepared to provide proof of completion to relevant department staff upon request.

**Topics Covered in the Training**

- Understanding terminology
- LGBTQIA2S+ History in the US and Oregon
- Best Practices for Communicating with LGBTQIA2S+ Residents and Residents Living with HIV
- Understanding Health and Social Challenges
- Creating a Safe and Affirming Environment

This training is designed to foster empathy, understanding, and cultural competence among long-term care facility staff to ensure that all residents receive respectful and inclusive care. By following these guidelines, long-term care facility staff can ensure they are providing the highest standard of care to all residents while respecting their diverse identities and needs.

For further information or assistance, please contact your licensing team:

NF.licensing@odhsoha.oregon.gov
CBC.Team@odhsoha.oregon.gov


Oregon Department of Human Services

# EXHIBIT "K"

3:13



**2 People** >

meantime, we will have to suspend you effective immediately, pending the approval of the exemption. If the religious exemption is not approved by DHS, we will proceed with termination. You will have one week to secure the exemption. Thank you.

1/10/25

Today 2:25 PM

Renee Rickard

Hi Katherine, we still have not received a religious exemption from you from DHS for the Oregon Care Partners training "Providing Inclusive Care". Since we still have not received that, we have to terminate you effective immediately for failure to comply with mandated training required by the State of Oregon/OARs. You have not worked this pay period so there is no final pay due to you. Please turn in your uniforms, keys, key fob, and name tags at your earliest convenience.

+    Text Message · SMS

# EXHIBIT "L"



**BUREAU of LABOR & INDUSTRIES**

March 13, 2026


KATHERINE G TALMAN
10507 SE STEELE ST
PORTLAND, OR 97266


RE:     Complainant:  Katherine G Talman
        Respondent:  Chestnut Lane Operations Llc Dba Avamere At Chestnut Lane
        Case #:        STEMRG251204-11841


Due to a large increase and a significant backlog of claims, the Bureau of Labor and Industries does not have the resources to investigate all complaints it receives. Because of this, we are currently taking emergency measures and prioritizing certain types of cases.

You are receiving this communication because the Bureau does not have capacity to fully investigate your case.   We believe that BOLI should be able to investigate all claims and are working to address the long-standing underinvestment in the agency. In the future, BOLI may be able to investigate all filed claims. Please check https://www.oregon.gov/boli/about/Pages/Claim-and-Complaint-Triage.aspx for updates and information about whether BOLI has ended this triage process.

Within two weeks of closing your case based on limited resources, we will send a copy of the response we received from the respondent to the current email address we have on file for you.  There will generally not be other records in your file to request through public records.


COMPLAINANT'S NOTICE OF RIGHT TO FILE A CIVIL SUIT
Pursuant to ORS 659A.880, you as the Complainant have at least 90 days from the date of this notice to file a civil action against the Respondent under ORS 659A.885. You **may** have longer than 90 days – you have the longer of 90 days **or** the remainder of the original statute of limitations (either one year or five years from the date of the alleged violation), whichever is longer. A list of statutes of limitation that may apply to your case is available here: https://assets.osbplf.org/2022%20OSTL_Revised.pdf.

Any right to bring a civil action against the Respondent under ORS 659A.885 will be lost if the civil action is not commenced within the required period. Determining the statutory deadlines apply to your case can be challenging; We encourage you to consult with an attorney without delay and pursue any such action within 90 days of the date of this mailing in order to ensure that your rights are preserved.

If you wish to pursue civil action and your complaint is against a "public body" (as defined in ORS 30.260(4)), you must also comply with the Oregon Tort Claims Act (ORS 30.260 to 30.300). Generally, this requires you to provide notice of your tort claim to that public body within 180 days of the most recent harm you suffered. Please note that the requirement to file a tort claim is often not met by filing civil rights complaint with BOLI.

If the complaint was a public accommodations case filed under ORS 659A.403 or 659A.406, the right to file suit in state circuit court expires one year from the date of the alleged violation.


 Portland • Salem • Eugene

oregon.gov/boli
Help@boli.oregon.gov

 971-245-3844
Ore. Relay TTY: 711

BOLI maintains a list of attorneys who may be able to assist complainants at  https://www.oregon.gov/boli/about/pages/contact-us.aspx. The Oregon State Bar also provides an attorney referral service that can be accessed by phone at 503-620-0222 or 800-452-7636, or online at https://www.osbar.org/public/ris.

If you wish to receive a copy of this file, you may place a request for public records online through our website https://www.oregon.gov/boli/about/Pages/public-records-request.aspx or by calling 971-245-3844.

Sincerely,

CIVIL RIGHTS DIVISION
Administrative Support Unit

**Date of Mailing**: March 13, 2026

Enclosure(s)


Portland • Salem • Eugene

**oregon.gov/boli**
Help@boli.oregon.gov


971-245-3844
**Ore. Relay TTY:** 711

# EXHIBIT "M"

# Date Calculator: Add to or Subtract From a Date

Enter a start date and add or subtract any number of days, months, or years.

Count Days     **Add Days**     Workdays     Add Workdays     Weekday     Week №

From **Friday, March 13, 2026**
Added 90 days

## Result: Thursday, June 11, 2026

### Calendar showing period from March 13, 2026 to June 11, 2026

| March 2026 — 18 days added | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April 2026 — 30 days added | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May 2026 — 31 days added | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June 2026 — 11 days added | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

☐ = Start date (Mar 13, 2026)   ☐ = Final result date (Jun 11, 2026)